**AFFIRM; and Opinion Filed November 13, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00599-CR

**KIERON ALEXANDER, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F-1575823-I**

## MEMORANDUM OPINION
Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Fillmore

A jury found Kieron Alexander guilty of murder and assessed punishment of fifty-five years' confinement. In his first issue, Alexander contends the evidence was insufficient to support his conviction because it failed to establish beyond a reasonable doubt that he caused the victim's death and it failed to support the jury's implicit rejection of his claim of self-defense. In his second issue, Alexander contends the trial court erred by admitting into evidence video recorded statements Alexander made while in police custody because he did not waive his *Miranda* rights or his rights under article 38.22 of the Texas Code of Criminal Procedure prior to interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966). We affirm the trial court's judgment.

# BACKGROUND

## *Traylor's Testimony*
## *and the Recorded Jailhouse Call*

On the afternoon of June 22, 2015, Bertha "Ebony" Traylor[1] found Kieron "Key" Alexander, her friend of fifteen years, "standing asleep" in front of a convenience store. Traylor testified Alexander "didn't look good" and "like he hadn't had sleep in a long time." Because Alexander did not have anywhere to go and had been "living on the streets," Traylor told him to go to her apartment to get some sleep.[2] When Traylor returned to the apartment, Alexander was there "walking around." Alexander told Traylor he had not slept for "[t]oo many days to remember," and had been "smoking ice." Traylor gave Alexander some pizza and recommended that he get some sleep. Traylor's boyfriend, Lamarcus Adams, two of Traylor's female friends, and Habtamu Gessese,[3] were also at the apartment.

An hour or two later, Ricky Griffin, a crack cocaine user, arrived at the apartment "high and drunk" to buy drugs from Traylor.[4] Traylor had known Griffin for four years and considered him a close friend. Traylor testified Griffin "had an addiction but . . . wasn't a street person," and was not "from the hood," so she "kept a special watch on him." Griffin took pain medication for a neck injury and medication to address congestive heart failure, but Traylor did not know if Griffin had taken medication that day. Alexander was still awake when Griffin arrived at the apartment, but the two men did not "have any conversation."

According to Traylor, Griffin became "real paranoid," quiet, and "g[ot] in close to people" when he was high on drugs. At the apartment, Griffin "was walking around . . . near people . . .

---

[1] Traylor testified she was a "crack head" and she "prostitute[d] for money to buy . . . drugs." At the time of trial, she was serving a three year sentence for possession of less than a gram of methamphetamine.

[2] Traylor was staying in the apartment, leased by her friend, while her friend was "in rehab." At the time of the offense, the apartment complex was named Jackson Branch Apartments.

[3] Traylor testified she did not know Gessese, but used his car to run errands on June 22, 2015.

[4] Griffin drove himself to the apartment. Traylor told Gessese to leave the apartment when Griffin arrived.

maybe getting too . . . close [to them], maybe even close to [Alexander]," so Traylor instructed Griffin to sit down so no one would "mess with" him. According to Traylor, Griffin "[wouldn't] hurt a fly" and "wouldn't do nothing to nobody." While Traylor was in the apartment, Alexander and Griffin were separated and did not have any disagreements or altercations.

Traylor and Adams decided to leave the apartment to, among other things, purchase crack cocaine.[5] Traylor testified that before departing the apartment, she noticed Alexander was awake in the bedroom and "looked delusional," and Griffin was in the living room and appeared "paranoid." Traylor told Alexander to go to sleep, and told Griffin to stay in the living room and she would "bring some crack back." When Traylor and Adams returned to the apartment complex about two hours later, Traylor saw Griffin "laid out" on the floor with a "little[,] small fire" burning on the carpet.[6] According to Traylor, Griffin's face was black with what "[she] thought . . . was smut" from smoking crack cocaine.[7] Traylor did not see Alexander in or around the apartment. She called Alexander's name but did not go further into the apartment.

Traylor extinguished the fire with her purse, and went outside to tell Adams that Griffin was "passed out" on the floor and the apartment was on fire. After looking in the apartment, Adams said, "back up out of here," and closed the door. Traylor and Adams went outside, and Traylor called 911. Traylor learned Griffin was dead when the paramedics carried him out of the apartment. After being questioned at the scene by a Dallas police detective, Traylor and Adams were taken to the police department where they were interviewed by Dallas Police Department homicide Detective Eric Barnes. Traylor identified Alexander in a photograph and said he was the last person with Griffin before his death.

---

[5] Traylor's two female friends left at the same time, leaving Griffin and Alexander alone in the apartment.

[6] Adams was still in the parking lot when Traylor entered the apartment.

[7] According to Traylor, there was no crack cocaine at the apartment when Griffin arrived.

After he was arrested for the murder of Griffin, Alexander called Traylor from jail. In the audio recorded telephone call, which was played for the jury, Traylor told Alexander she was traumatized by the murder and she "didn't want to be a part of this," but felt she "opened the door to" the murder because Alexander and Griffin met at her apartment. Traylor told Alexander, "I was just trying to help you." Alexander replied, "I know you was. It was self-defense." Alexander claimed Griffin "tried to do some gay shit" and "kept messing with me. Then like I thought he was trying to fight me." "He had a knife . . . then we were fighting." Alexander said Griffin came into the bedroom and stood over him with his shirt off when Alexander was trying to sleep, and "that's when I got up and started putting hands on him." Alexander stated he did not use a "weapon." He told Traylor he beat up Griffin with his hands, put Griffin in a chokehold, and "blacked-out" when they started fighting. Alexander also told Traylor he "ended up coming back to the scene that night on accident." Alexander denied he had been "smoking ice" the day of the murder. On the call, Traylor responded that Alexander had told her he had been "smoking ice," but at trial, she stated it was out of character for Alexander to "smoke ice." Traylor testified, "[Alexander] doesn't do ice. That why when he said it was kind of like, you don't smoke ice, but he said he did. I don't know." According to Traylor, "ice" is "[j]ust like crack, it just keeps you up . . . it affects people differently."

### Firefighter Pfuhl's Testimony

Chris Pfuhl, a fire fighter and paramedic with the Dallas Fire Department, responded to the 911 dispatch for an unconscious person at the apartment. Pfuhl testified, "we got there and there was a black lady outside kind of frantic and saying, my friend is dead." The apartment door was open, and they saw Griffin on the floor. Pfuhl and his partner checked Griffin's vital signs, and found no signs of life. According to Pfuhl, the carpet and a sheet under Griffin's head and next to his face were burned. Pfuhl did not see a fire, smoldering, or smoke, and did not retrieve fire

–4–

equipment to extinguish any possible hot spots. Pfuhl and his partner exited the apartment without inspecting the other rooms.

*Officer Negron's Testimony*

On the night of the murder, Dallas Police Department officer Marcus Negron responded to a call regarding a homicide at the apartment. Officer Negron secured the crime scene with caution tape, blocking off the apartment, the hallway leading to the apartment, and a portion of the parking lot. Officer Negron was posted at the apartment door with Officer Griffin[8] to prevent non-authorized persons from entering the secured areas. Officer Negron testified they saw Alexander cross under the caution tape from the parking lot into the hallway. When they asked Alexander what he was doing, he crossed back under the caution tape into the parking lot and stood there looking at them. Alexander did not respond to the officers' questions.

Officer Negron knew a witness had "said something about a key." Officer Griffin obtained Alexander's identification and said, "oh, your name is Kieron. Key-ron." The officers realized the witness may have been referring to Alexander, and Officer Griffin left to inform Detective Barnes that Alexander was at the scene. Officer Negron remained in the parking lot with Alexander. Officer Negron testified, "then [Alexander] just kind of made a few statements, he said, 'Man this stuff is crazy. My PTSD, man, I just snapped'."[9] Alexander looked "extremely agitated," "made a fighting stance," "balled up his fists," and was "punching his fist pretty hard" like he was "amped up." Officer Griffin returned and advised Alexander that a detective wanted to speak with him. Alexander was handcuffed and taken to the police department.

---

[8] Officer Griffin did not testify, and was not identified by his first name in the trial transcript.

[9] Alexander served fifteen months in the U.S. Army, and was stationed stateside at various bases. During the punishment phase of trial, Craig McNeil, a twenty-two year veteran of the U.S. Army and former judge advocate, provided testimony concerning Alexander's discharge for drug use. Alexander received a general discharge from the U.S. Army, which is neither honorable nor dishonorable.

Detective Barnes was called to the scene. Inside the apartment, Detective Barnes observed Griffin lying on his side on the living room floor with heavy trauma to his head, and burn marks on the carpet and a sheet next to Griffin. Detective Barnes recovered Griffin's cellphone, wallet, and driver's license. Detective Barnes also recovered eyeglasses similar in appearance to eyeglasses Griffin wore. Alexander's fingerprint was identified on the eyeglasses. Drug paraphernalia and several lighters, including a lighter under Griffin's body, were also found at the apartment. Unsure what caused the victim's death, Detective Barnes and a team of detectives conducted a thorough search of the apartment and other areas of the apartment complex, including stairways, dumpsters, bushes, and the parking lot, but did not locate a weapon. Detective Barnes testified he was unable to determine whether a weapon other than "hands and feet" was used in connection with Griffin's death.

Detective Barnes learned that Alexander was the last known person to be with Griffin prior to his death, went by the nickname "Key," had been photo-identified by Traylor, and was detained as a suspect. At the police department, Alexander was in an interrogation room equipped with an audio-video recording device. A time-stamped video recording began at approximately 12:17 a.m. on June 23, 2015, and showed Alexander sitting alone with his head on a table until Detective Barnes entered the interrogation room at approximately 1:18 a.m. At trial, Detective Barnes confirmed, "Alexander from the beginning had his hands inside his shirt and had his shirt over his face and he was laying his head down on the table." Detective Barnes testified that Alexander conversed with officers at the scene, but "by the time he got into the interrogation room he was too tired to keep his head off the table and he was too cold to keep his shirt off his face." Because Alexander's demeanor changed between being taken into custody and entering the interrogation room, Detective Barnes believed "[covering his face with his shirt and putting his head on the

–6–

table] was for more of an act" because he did not want to talk about his involvement in Griffin's death.  The recording of Alexander's interrogation was introduced into evidence at trial over the objection of defense counsel that Alexander had not waived his Fifth Amendment right against self-incrimination.

Upon arriving in the interrogation room, Detective Barnes roused Alexander, offered him a candy bar, and asked him if he needed to use the restroom.  At various points during the ensuing interrogation, Alexander did not comply with Detective Barnes's requests to sit up and take his head off the table.  Stating he wanted to ask Alexander about what happened that day, Detective Barnes placed a *Miranda*[10] warning card next to Alexander and said, "But I got to read you this first, and then with your permission, I'm going to ask you a couple of questions.  If you give me permission.  All right?"  Alexander sat up and glanced at the card.  Detective Barnes read Alexander his *Miranda* rights, and asked Alexander if he understood.  Alexander responded, "Yes, sir," then covered his head with his shirt and placed his head back on the table.  Detective Barnes then questioned Alexander about what happened.

Alexander's head was on the table and covered by his shirt for most of the interview.  Although he did not respond or had a delayed response to some of Detective Barnes's questions, he answered other questions clearly and quickly, conversing with Detective Barnes about the events leading up to Griffin's death.  Alexander said he did not know Griffin, he "stayed to himself" in the bedroom at the apartment because of his "nerves," he suffered from PTSD, Griffin made a homosexual pass at him, and he "just clicked."

When asked how many times he hit Griffin, Alexander said his "PTSD clicked in and [he] just . . . went blank."  Alexander said, "and that gay pass, I just felt nervous, I just felt nervous, I didn't feel right."  Alexander stated he "got into it" with Griffin in the living room, and "when [he]

---

[10] *Miranda v. Arizona*, 384 U.S. 436 (1966).

came to, it was too late." When asked what he "hit [Griffin] with," Alexander replied that he "used his hands." Detective Barnes examined both sides of Alexander's hands, and did not comment as to any injuries. At trial, Detective Barnes testified that photographs taken of Alexander after his arrest showed he had "some scrapes, lacerations" on his knees "and maybe a few little ones on his hands." The injuries were "[n]othing major, but there were some open wounds."

During the recorded interrogation, Alexander stated he did not burn the carpet in the apartment. However, when asked where he "got the lighter from," Alexander told Detective Barnes the lighter "was available" and he "just set it on fire, man." Alexander did not identify what he set on fire. At trial, Detective Barnes confirmed that Alexander did not request an attorney or ask to terminate the interrogation at any time.

### Dr. Quinton's Testimony

Dr. Reed Quinton, the Dallas County deputy chief medical examiner who performed the autopsy on Griffin, testified Griffin sustained a small amount of thermal injury on his chin, cheeks, and forehead, and a small amount of singed hair. Dr. Quinton believed the fire was set after Griffin's death because there was no evidence of smoke inhalation. Griffin's autopsy revealed he sustained "a lot of bruising" and lacerations on his face; sharp force injuries on his face, neck, arm, and hands; bruising on his chest; and "defensive" injuries on his arm and fingers. Dr. Quinton noted indicators of strangulation, including hemorrhages of the right eye and hemorrhages or bruising within the layers of the neck musculature. There were no ligature marks on Griffin's neck, leading Dr. Quinton to believe Griffin was strangled by someone's hands rather than by use of an object. Griffin sustained "a lot of different blunt force injuries," including blunt force trauma to the head. A fractured bone in Griffin's face indicated "there was a blow . . . or blunt force trauma sustained on that side." Dr. Quinton did not know what object caused the blunt force injuries. According to Dr. Quinton, Griffin's injuries were consistent with someone's hands

"being used as a deadly weapon," and he could not "rul[e] out" the use of a foot as a deadly weapon. The "totality of all of [Griffin's] injuries" contributed to his death.

Griffin had cocaine, cocaine metabolites, alcohol, an antidepressant, and muscle relaxant in his system when he died. Griffin was obese, and had coronary artery disease and high blood pressure, but did not have blood pressure medication in his system at the time of his death. Dr. Quinton testified Griffin's enlarged heart and blockage in his arteries could have contributed to his death. Dr. Quinton confirmed his autopsy report's conclusion that Griffin died "as a result of homicidal violence, including blunt force injuries, strangulation and sharp force injuries."

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Alexander complains the evidence was insufficient to support his conviction for murder and to support the jury's implicit rejection of his self-defense claim. Specifically, Alexander contends the evidence failed to establish beyond a reasonable doubt that Alexander caused Griffin's death.

### Standard of Review

We review the sufficiency of the evidence under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). *Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). We examine all the evidence in the light most favorable to the verdict, and based on that evidence and reasonable inferences therefrom, determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Balderas v. State*, 517 S.W.3d 756, 765–66 (Tex. Crim. App. 2016), *cert. denied*, 137 S.Ct. 1207 (2017). It is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Although our analysis considers all evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the factfinder. *Id.*; *King*

*v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). When there is conflicting evidence, we presume the factfinder resolved the conflict in favor of the verdict, and defer to that resolution. *Jackson*, 443 U.S. at 326; *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."). The standard of review is the same for both direct and circumstantial evidence cases. *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010).

In evaluating a sufficiency challenge, we consider all evidence presented to the jury, regardless of whether it was properly or improperly admitted. *Clayton*, 235 S.W.3d at 778. In our review, we consider both direct and circumstantial evidence, and all reasonable inferences that may be drawn therefrom. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Each fact need not point directly and independently to the defendant's guilt, so long as the cumulative force of all the evidence, when coupled with reasonable inferences to be drawn from that evidence, is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13; *see also Wise v. State*, 364 S.W.3d 900, 902–03 (Tex. Crim. App. 2012) (evidence is sufficient if the inferences necessary to establish guilt are "reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict."). Circumstantial evidence is as probative as direct evidence and, alone, can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 13.

When an appellant challenges the sufficiency of the evidence supporting the implicit rejection of a self-defense claim, we determine, after viewing all the evidence in the light most favorable to the verdict, whether any rational factfinder would have found the essential elements of the murder beyond a reasonable doubt, and also would have found against the defendant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Gaona v. State*, 498 S.W.3d 706, 709 (Tex. App.—Dallas 2016, pet. ref'd). Self-

defense is not an affirmative defense. It is a defense with burdens at trial that alternate between the defendant and the State. *Zulani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (self-defense is "classified as a defense, as opposed to an affirmative defense"). The initial burden to produce evidence supporting a self-defense claim rests with the defendant. *Id.* Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the defense by proving its case beyond a reasonable doubt. *Id.*

We review sufficiency challenges to the jury's implicit rejection of a self-defense claim under the *Jackson v. Virginia* standard. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Whether the defendant acted in self-defense is a fact issue to be determined by the jury, and the jury exclusively determines the weight and credibility of the evidence in support of a self-defense claim. *Id.* at 146. We defer to the factfinder's resolution of conflicting inferences in the record. *Jackson*, 443 U.S. at 326. The jury implicitly rejects a defendant's self-defense claim if it finds the defendant guilty. *Saxton*, 804 S.W.2d at 914. In assessing a self-defense claim, the jury may consider the totality of the circumstances leading up to, during, and after the use of force. *See Whipple v. State*, 281 S.W.3d 482, 497–98 (Tex. App.— El Paso 2008, pet. ref'd) (considering circumstances before and after shooting).

*Applicable Law*

In relevant part, a person commits the offense of murder if he (1) "intentionally or knowingly causes the death of an individual" or (2) "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1)–(2). A person acts intentionally with respect to a result of his conduct when "it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

"[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a).

A person is justified in using deadly force against another:

(1) if the actor would be justified in using force against the other under Section 9.31; and

(2) when and to the degree the actor reasonably believes the deadly force is immediate necessary:

(A) to protect the actor against the other's use or attempted use of unlawful deadly force . . .

*Id.* § 9.32(a). "Deadly force" is force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury. *Id.* § 9.01(3).

*Analysis*

Alexander complains the evidence was insufficient to support the jury's finding that he caused Griffin's death. Alexander contends there were no eyewitnesses, no DNA evidence, and little, if any, physical evidence connecting him to Griffin's death. Although his fingerprint was on eyeglasses similar to Griffin's eyeglasses, Alexander argues there was no definitive proof the eyeglasses belonged to Griffin. Moreover, Alexander maintains his statements "allud[ing] to a homosexual pass being made at him" and that he "just clicked" lacked sufficient detail, and "could have been referring to anyone or some other incident."

The jury heard testimony that Alexander was the last person seen with Griffin before he died. Alexander had been "smoking ice," looked delusional, and told Traylor he had not slept for days. The State presented evidence that, prior to his death, Griffin—drunk, high, and paranoid— was standing "too close" to people in the apartment, including Alexander. Concerned that someone would "mess with [him]," Traylor testified she kept an eye on Griffin and separated him from the other people in the apartment, because Griffin "[wouldn't] hurt a fly." Before leaving

–12–

Alexander and Griffin alone in the apartment, Traylor sent Alexander to the bedroom and told Griffin to stay in the living room.

The jury listened to a recording of the telephone call Alexander made to Traylor from jail. The jury heard Alexander tell Traylor he acted in self-defense because Griffin was "messing with" him, and "tried to do some gay shit." Alexander admitted he "started putting hands on" Griffin when he was in bed and saw Griffin standing over him with his shirt off. The jury heard Alexander tell Traylor he beat up Griffin with his hands and put him in a chokehold. The evidence showed that on the night of the murder, Alexander returned to the scene of the crime looking "extremely agitated" and "amped up," and took a fighting stance and punched his fists in the air. Officer Negron testified that Alexander told him he had PTSD and "just snapped."

The jury watched the video recording of Detective Barnes's custodial interrogation of Alexander. The jury observed Alexander telling Detective Barnes that Griffin made a homosexual pass at him, and he "just clicked." Alexander said he "got into it" with Griffin in the living room, and "when [he] came to, it was too late." The jury heard Alexander say he did not use anything other than "his hands" to hit Griffin.

Finally, Dr. Quinton testified that Griffin's autopsy revealed blunt force trauma to Griffin's head and face. Hemorrhaging and bruising of Griffin's eye and neck indicated he had been strangled. Griffin's autopsy, however, revealed no ligature marks on Griffin's neck. Corroborating Alexander's statements in his recorded telephone call to Traylor and during his interrogation that he only used his hands to attack Griffin, the jury heard Dr. Quinton testify the lack of ligature marks indicated Griffin was strangled by someone's hands "being used as a deadly weapon" and not an object. Dr. Quinton concluded that Griffin's death was caused by homicidal violence. Viewing the cumulative force of all of the evidence in the light most favorable to the

–13–

verdict, we conclude a rational jury could have found, beyond a reasonable doubt, that Alexander committed the offense of murder.

Alexander also complains the evidence was insufficient to support the jury's implicit rejection of his self-defense claim. In his recorded telephone call to Traylor from jail, Alexander claimed Griffin had a knife. Detective Barnes, however, testified that he and other detectives thoroughly searched the apartment and apartment complex, including stairways, dumpsters, bushes, and the parking lot, and did not locate a weapon. Officer Negron testified that on the night of the offense, Barnes said he had "PTSD" and "just snapped." The jury heard Alexander admit in his recorded interrogation that he "just clicked." Finally, although Alexander claimed "it was self-defense" in his recorded telephone call to Traylor from jail, the jury also heard Alexander tell Traylor he "didn't know what [Griffin] was doing" when he saw Griffin standing over him with his shirt off, but "that's when [he] got up and started putting hands on him," placed Griffin in a chokehold, and "blacked out" when they started fighting. As the sole judge of credibility and weight to be given the testimony, the jury was entitled to reject Alexander's statement that Griffin threatened Alexander with a knife. On this record, a rational jury also could have found that Alexander was not justified in using deadly force to protect himself from a homosexual pass, if any, by Griffin. Viewing the cumulative force of all of the evidence in the light most favorable to the verdict, we conclude a rational jury could have found against Alexander on the self-defense issue beyond a reasonable doubt.

Accordingly, we resolve Alexander's first issue against him.

### WAIVER OF RIGHTS UNDER *MIRANDA* AND TEX. CODE CRIM. PROC. ANN. art. 38.22

In his second issue, Alexander argues the trial court erred by admitting the recording of his interrogation into evidence, because he did not expressly or implicitly waive his *Miranda* rights or his rights under article 38.22 of the Texas Code of Criminal Procedure prior to the interrogation.

–14–

At trial, Alexander objected to the admission of the recorded interrogation on the grounds he did not waive his Fifth Amendment right against self-incrimination. The trial court overruled the objection and admitted the recording into evidence without making findings of fact or conclusions of law regarding the voluntariness of Alexander's waiver. Portions of the recording were played for the jury.

By order dated September 20, 2018, we abated this appeal and ordered the trial court to prepare the requisite findings and conclusions concerning the voluntariness of Alexander's waiver. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6. Pursuant to this Court's order, the trial court made findings of fact as to the voluntariness of Alexander's waiver. Among other things, the trial court found: "[Alexander] was advised of his *Miranda* warnings by Detective Barnes" and "[Alexander] acknowledged that he understood his rights"; "[d]uring the interview, [Alexander] was still wearing his street clothes" and "was not shackled or handcuffed"; "[Alexander] gave his statement after an implicit waiver of his rights under Article 38[.]22 and *Miranda* that was done both knowingly and voluntarily"; "[Alexander] was awake, coherent, and specific with his answers during the interrogation"; "[Alexander] never requested an attorney or asked to terminate the interview"; and "[Alexander] voluntarily gave his statement and there were no promises, threats, or coercion made by Detective Barnes or any other officer."

On appeal, Alexander complains the trial court erred in admitting the video recorded interrogation because Detective Barnes only asked Alexander if he understood his rights, and not whether he waived his rights. Alexander also argues he did not sign or initial any documents indicating he wanted to waive his rights. Alexander further avers that the circumstances depicted in the video recording, including evidence he was "extremely tired," "could barely stay awake," and "was apparently under the influence of ice," do not support a knowing, intelligent, and voluntary waiver of his *Miranda* rights or his rights under article 38.22. The State responds that

–15–

article 38.22 does not require a written or express oral waiver, and that waiver may be inferred from Alexander's actions and words. The State argues the totality of the circumstances surrounding Alexander's interrogation shows he implicitly waived his rights knowingly and voluntarily, without police intimidation, coercion, or deception.

*Standard of Review and Applicable Law*

We review a trial court's denial of a motion to suppress a statement provided by a defendant during a custodial interrogation for an abuse of discretion, and apply a bifurcated standard of review. *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016). We afford almost complete deference to the trial court's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor. *Id.* However, we conduct a de novo review of mixed questions of law and fact that do not hinge on credibility or demeanor. *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016). When, as here, the trial court made explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports the fact findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). We sustain the trial court's ruling if it is correct under any applicable theory of law. *Furr*, 499 S.W.3d at 877.

In *Miranda*, the Supreme Court held that when an individual is taken into custody and subjected to questioning, he must be warned prior to any questioning that he has the right to remain silent, anything he says can be used against him in a court of law, he has the right to the presence of an attorney, and if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. 384 U.S. at 479. An individual given these warnings may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *Id.*

Article 38.22 of the Texas Code of Criminal Procedure governs the admissibility of statements made by a defendant during custodial interrogation in a criminal proceeding. *Herrera*

–16–

*v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). Article 38.22 provides no oral statement made by an accused during a custodial interrogation is admissible as evidence against him in a criminal proceeding unless the accused, prior to making the statement but during the recording, was provided with warnings virtually identical to those required by *Miranda* and a warning that he has the right to terminate the interview at any time, and the accused knowingly, intelligently, and voluntarily waived the rights set out in the warning. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a)(2).

The State has the burden of showing by a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his rights under *Miranda* and article 38.22. *See Leza v. State*, 351 S.W.3d 344, 349, 351 (Tex. Crim. App. 2011). In evaluating whether a defendant waived his rights, we consider: (1) whether the waiver was made voluntarily, which is defined as being a product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) whether the waiver was made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010). Only if the totality of the circumstances surrounding the interrogation reveals both an un-coerced choice and the requisite level of comprehension may a court properly conclude that rights have been waived. *Id.* The "totality of the circumstances" analysis requires the consideration of all the circumstances surrounding the interrogation, including the defendant's experience, background, and conduct. *Id.*

*Analysis*

Alexander contends he was not asked for and did not provide a written or oral waiver of his rights. However, neither a written nor an express oral waiver is generally required. *Id.* at 24. Article 38.22 does not require that the defendant expressly or explicitly waive his rights, nor does it require that he be asked whether he wishes to waive his rights. TEX. CODE CRIM. PROC. ANN.

art. 38.22. The statute requires only that the requisite warnings be given to the defendant and that his waiver of rights be made knowingly, intelligently, and voluntarily. *Id.*, art. 38.22 § 3(a)(2).

Nor does *Miranda* require a waiver to assume a particular form; at least in some cases, a "waiver can be clearly inferred from the actions and words of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). We may conclude Alexander waived his *Miranda* rights if the "totality of the circumstances surrounding the interrogation" reveals an un-coerced choice and the requisite level of comprehension. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

*Voluntariness.* Our examination of the totality of the circumstances surrounding the interrogation shows Alexander made a free and deliberate choice to voluntarily waive his rights. In the recording of Alexander's interrogation, Detective Barnes said he wanted to talk to Alexander about "what happened [that] day." Placing a card on the table next to Alexander, Detective Barnes explained, "[b]ut I got to read you this first, and then with your permission, I'm going to ask you a couple of questions. If you give me permission. All right?" Alexander replied, "Yeah, man," and sat up. Detective Barnes then stated, "This is your *Miranda* warning," and proceeded to read Alexander his *Miranda* rights from the card. Detective Barnes also told Alexander he could "terminate this interview" at any time. When asked if he understood, Alexander replied, "Yes, sir." Alexander remained upright for the duration of his *Miranda* warning.

Alexander did not request an attorney or ask Detective Barnes to terminate the interrogation at any time. He freely chose to answer some of Detective Barnes's questions with clarity and detail. For example, Alexander made clear he was not comfortable with Griffin's homosexual pass, telling Detective Barnes, "and that gay pass, I just felt nervous, I just felt nervous, I didn't feel right." He also chose to not answer some of Detective Barnes's questions, further suggesting the statements he did make were voluntarily provided. The recording of Alexander's interrogation shows no evidence of intimidation, coercion, or physical or psychological pressure to elicit

–18–

statements from Alexander. In its findings of fact, the trial court noted that Detective Barnes was conversational and polite throughout the interview, and never yelled, cursed or appeared angry. The trial court's findings confirmed Detective Barnes's testimony that he took care of Alexander's basic needs, noting that Detective Barnes provided a candy bar to Alexander and asked him if he was hungry or needed to use the restroom, and Alexander responded, "No, I'm good."

*Awareness*. The totality of the circumstances surrounding the interrogation also shows Alexander's waiver was made with full awareness of both the nature of the rights he abandoned and the consequences of his decision to abandon them. *See Joseph*, 309 S.W.3d at 27. The warnings Detective Barnes read to Alexander made him fully aware of his rights under article 38.22 and *Miranda*, and of the consequences of waiving those rights. TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a)(2). Alexander affirmatively acknowledged that he understood his rights, and his conduct during the interrogation demonstrated he possessed the requisite level of comprehension.

We are unpersuaded by Alexander's arguments regarding the influence of his fatigue and "ice" intoxication on the knowing, intelligent, and voluntary waiver of his rights. *See, e.g., Leza*, 351 S.W.3d at 352–53 (concluding waiver of *Miranda* rights not involuntary where heroin intoxication, if any, was not so acute as to overcome defendant's capacity to resist reasonable, non-coercive tactics by police to persuade him to waive rights). The trial court—the exclusive judge of the credibility of the witnesses and the weight to be given their testimony—found Detective Barnes to be a credible witness. Detective Barnes testified that just before being taken into custody and entering the interrogation room, Alexander was conversing with officers at the scene. Detective Barnes believed Alexander put his shirt-covered head on the table as "an act" because "he didn't want to talk about [the] fact he was involved in [the] death of Mr. Griffin." Moreover, Detective Barnes testified he asked Alexander certain questions to "get a feel" for his "level of

–19–

awareness" and Alexander was able to recall and provide "details about being in the military," and to spell his name. Alexander also answered Detective Barnes's questions lucidly, and occasionally with sarcasm. For example, Detective Barnes testified that when he asked Alexander "what time [it was] when he went over to the apartment when all this happened," Alexander said he did not know because he did not look at his watch. Additionally, the trial court's findings of fact indicate Alexander "was awake, coherent, and specific with his answers during the interrogation."

Notwithstanding any alleged "ice" intoxication, from the totality of the circumstances the trial court could rationally conclude and did not abuse its discretion in finding that Alexander knowingly and voluntarily waived his *Miranda* and article 38.22 rights. Giving proper deference to the trial court's findings and evaluations of witness credibility and demeanor, we conclude the evidence supports the trial court's finding that Alexander knowingly and voluntarily waived his rights. We resolve Alexander's second issue against him.

We affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

170599F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

KIERON ALEXANDER, Appellant

No. 05-17-00599-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 2, Dallas County, Texas
Trial Court Cause No. F-1575823-I.
Opinion delivered by Justice Fillmore,
Justices Lang and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 13th day of November, 2018.